Michael J. MEDLOCK *v.* STATE of Arkansas

CA CR 02-126 89 S.W.3d 357

Court of Appeals of Arkansas
Division IV
Opinion delivered November 13, 2002

*Law Offices of Charles Karr, P.A.*, by: *Shane Roughley*, for appellant.

*Mark Pryor*, Att'y Gen., by: *Clayton K. Hodges*, Ass't Att'y Gen., for appellee.

KAREN R. BAKER, Judge. A jury sitting in Sebastian County convicted appellant, Michael Medlock, of aggravated robbery and sentenced him to fifty-six years' imprisonment in the Arkansas Department of Correction. Appellant presents six points on appeal: 1) that there was insufficient evidence to support his conviction; 2) that the trial court erred in admitting a previous conviction; 3) that the trial court erred in admitting testimony about the victim's subsequent death; 4) that appellant's arrest was illegal, and the evidence stemming from that arrest should have been suppressed; 5) that the trial court erred in not suppressing the evidence found from the search of appellant's vehicle; 6) that the trial court erred in allowing the State to exercise a peremptory challenge to strike an African- American. We affirm on all points.

On October 5, 2000, around 10:00 in the evening, Ms. Lewis, eighty-three years of age, was alone in her home when she

heard a tapping noise at the back door. It was raining outside, and she assumed that the noise was related to the rain. Nonetheless, she went to the back to set her house alarm. The noise outside became more obvious, as if someone was pounding on the door. As Ms. Lewis was setting her house alarm, a man approached her from the front of her house. He knocked her to the floor as she unsuccessfully tried to set off her alarm. She was knocked down again by the intruder as she tried to stand and use the phone. The man took her wallet and fled from the home. In a recorded statement, Ms. Lewis described the intruder as a young, light-skinned, black male, without facial hair, who wore light-colored pants and no shirt.

Detectives Bates and Snell investigated Ms. Lewis's home the morning after the robbery. During the investigation, a smudge was observed on the doorway between the kitchen and dining room. Detective Snell identified the smudge as a print, and the print was lifted and compared to appellant's. The prints were a match. Detective Snell's findings were confirmed by Detective Luther Lonetree, a certified latent print examiner outside the crime laboratory, and Bobby Humphries, a latent print examiner from the crime laboratory.

Ms. Lewis suffered a broken leg. Dr. Marvin Mumme, an orthopedic surgeon, performed surgery on Ms. Lewis's leg. He predicted that her leg would take one year to heal. However, Dr. John Keintz, an internal medicine specialist, testified that during rehabilitation, Ms. Lewis suffered a buildup of fluid on her lungs due to a pre-existing diffuse coronary disease that was not amenable to surgery. One month following the robbery, Ms. Lewis passed away.

Ms. Lewis's neighbor, Mr. Charles Franklin, testified that the day before the robbery he saw a strange burgundy car parked outside Ms. Lewis's home, directly behind his driveway. That same day, he also saw a black man walking down the street carrying a gas can. Krista England, also one of Ms. Lewis's neighbors, testified that at 8:30 p.m. the night of the robbery she saw a black man in khaki pants and no shirt cut through Ms. Lewis's yard, and then disappear.

The officers were given two briefings regarding appellant as the robbery suspect. Appellant was said to be driving a red or maroon Buick with fictitious tags. Officer Larry Ranells testified that on October 7 he saw a black male driving a burgundy Buick. The officer began to follow appellant in his car and called in the license plate. The tags were in fact fictitious, and Officer Ranells ultimately made contact with appellant and arrested him. Detective Bates testified that he obtained appellant's consent to search the vehicle, and Officer Nate Copeland testified that he was in the room with appellant at the police station when Detective Bates called to speak with appellant and obtained his consent to search the vehicle. Officer Copeland was able to hear the conversation between Detective Bates and appellant because he was holding the phone for appellant. Officer Copeland said that Detective Bates asked him for consent to search the vehicle, and appellant agreed to the search. The search revealed a gas can located in the front seat of appellant's car.

## I. Sufficiency of the Evidence

■■■■ For appellant's first point on appeal, he argues that there was insufficient evidence to support his conviction of aggravated robbery. We disagree. This court treats a motion for directed verdict as a challenge to the sufficiency of the evidence. *Jenkins v. State*, 348 Ark. 686, 74 S.W.3d 628 (2002). When reviewing the sufficiency of the evidence, we determine whether there is substantial evidence to support the verdict, viewing the evidence in a light most favorable to the State. *Id.* The evidence to support a conviction, whether direct or circumstantial, must be of sufficient force and character that it will, with reasonable and material certainty and precision, compel a conclusion one way or the other. *Id.* (citing *Smith v. State*, 308 Ark. 390, 824 S.W.2d 838 (1992)). It must force the mind to go beyond speculation or conjecture and is not satisfied by evidence which gives equal support to inconsistent inferences. *Id.* We look only to the evidence that supports the verdict. *Id.* It is for the jury to resolve inconsistencies in testimony, and we will not disturb their credibility assessment. *Id.* (citing *Ellis v. State*, 279 Ark. 430, 652 S.W.2d 35 (1983)).

■ Arkansas has followed the trend of many jurisdictions which have held that the State puts before the jury substantial evidence when it proves that the defendant's fingerprints were found at the scene of the crime. *See Ashe v. State*, 57 Ark. App. 99, 942 S.W.2d 267 (1997) (citing Annotation, *Fingerprints, Palm Prints or Bare Footprints as Evidence*, 28 A.L.R.2d 1115, 1150-55 (1953 and Later Case Service)). In *Tucker v. State*, 50 Ark. App. 203, 901 S.W.2d 865 (1995), we reviewed our case law. Fingerprints, under some circumstances, may be sufficient to sustain a conviction. *See Brown v. State*, 310 Ark. 427, 837 S.W.2d 457 (1992) (fingerprints found both on the exterior window glass and inside the structure); *Howard v. State*, 286 Ark. 479, 695 S.W.2d 375 (1985) (fingerprint removed from the exact place where the robber was seen placing his hand as he vaulted into booth); *Ebsen v. State*, 249 Ark. 477, 459 S.W.2d 548 (1970) (fingerprints found on both sides of a plate glass window that had been broken in and propped up inside the store). However, as appellant asserts, fingerprints alone have been held to be insufficient. *See Standridge v. State*, 310 Ark. 408, 837 S.W.2d 447 (1992). In *Standridge*, a thumb print found on a disposable cup beside a tent that was several feet from marijuana plants was not enough where there was no evidence to suggest when or where the appellant had touched the cup, whether he had purchased it, or how it came to be near the marijuana. Likewise, in *Holloway v. State*, 11 Ark. App. 69, 666 S.W.2d 410 (1984), fingerprints on a piece of glass located outside the house where a burglary occurred were not enough. However, this case is unlike *Standridge* or *Holloway*.

In the case at hand, the muddy fingerprint on the doorway between the kitchen and the dining room, found by Detective Snell, was a match to appellant's. This match was confirmed by both Detective Lonetree and Bobby Humphries. There was also a description by Ms. Lewis of the intruder. She described him as a young, light-skinned, black, male, without facial hair, who wore light-colored pants and no shirt. Moreover, Ms. Lewis's neighbor testified that the day before the robbery there was a strange burgundy car parked outside Ms. Lewis's home, directly behind his driveway. That same day a black man was seen walking down the street carrying a gas can. The night of the robbery a black man in

khaki pants and no shirt was seen by another neighbor cutting through Ms. Lewis's yard, and then disappearing. In the days following the robbery, appellant became a suspect. He was seen by Officer Ranells on October 7 driving a burgundy Buick with fictitious tags. The officer began to follow appellant in his car and ultimately made contact with appellant. Appellant was arrested, and after obtaining his consent, his car was searched. A gas can was found in the front seat of his car.

Although circumstantial, the evidence may constitute substantial evidence to support a conviction. *Ross v. State*, 346 Ark. 225, 57 S.W.3d 152 (2001) (citing *Gregory v. State*, 341 Ark. 243, 15 S.W.3d 690 (2000)). The longstanding rule in the use of circumstantial evidence is that, to be substantial, the evidence must exclude every other reasonable hypothesis than that of the guilt of the accused. *Id.* The question of whether the circumstantial evidence excludes every hypothesis consistent with innocence is for the jury to decide. *Id.* Upon review, this court must determine whether the jury resorted to speculation and conjecture in reaching its verdict. *Id.* Overwhelming evidence of guilt is not required in cases based on circumstantial evidence; the test is one of substantiality. *Id.* We hold that, although circumstantial, there was sufficient evidence to support appellant's conviction of aggravated robbery in this case.

## II. Arkansas Rule of Evidence 404(b)

For his second point on appeal, appellant argues that the trial court erred in admitting a prior conviction under Arkansas Rule of Evidence 404(b) (2002). As for our standard of review, the admission or rejection of evidence under Rule 404(b) is committed to the sound discretion of the trial court, and this court will not reverse absent a showing of manifest abuse. *Gaines v. State*, 340 Ark. 99, 8 S.W.3d 547 (2000). Rule 404(b) provides that "evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

█ The State was allowed to introduce appellant's prior conviction as evidence of *modus operandi*. There are two requirements for introducing evidence of an unrelated prior act to show *modus operandi*, or a method of operation: "(1) both acts must be committed with the same or strikingly similar methodology; (2) the methodology must be so unique that both acts can be attributed to one individual." *See Williams v. State*, 343 Ark. 591, 36 S.W.3d 324 (2001) (citing *Frensley v. State*, 291 Ark. 268, 274, 724 S.W.2d 165, 169 (1987)). The first requirement is that there be a very high degree of similarity between the charged crime and the prior uncharged act. *Id.* The second requirement for admission as a method of operation is that the methodology be so unique that it independently identifies the accused as the perpetrator. *Id.* Our supreme court noted in *Williams* that:

> This court has allowed *modus operandi* evidence in some cases. In *Burmingham* [*v. State*, 342 Ark. 95, 27 S.W.3d 351 (2000)], one of the "blue-light rapist" cases, the court found that "comparing this witness's testimony to the events described by S.W., it appears that appellant performed his rapes following the same *modus operandi* on both victims." *Burmingham*, 342 Ark. at 108. The court then listed the similarities of the two incidents.
>
> In *Jacobs v. State*, 287 Ark. 367, 699 S.W.2d 400 (1985), this court allowed evidence of prior bad acts in an automobile breaking-and-entering case because the "similarity of method used to enter the vehicle is remarkable and the vehicles were all on the parking lot at McCain Mall." *Id.*, 287 Ark. at 369.
>
> In *Frensley* [*v. State*, 291 Ark. 268, 724 S.W.2d 165 (1987)], the court, after listing the similarities, allowed evidence of a prior crime in an aggravated robbery and kidnaping case stating:
>
> > Both actions were committed in the same unique fashion. Further, the two acts were so unique and uncommon that they became distinctive and identifying. The two acts establish a method of operation. The inference is clear, there were not two different robbers. *Frensley*, 291 Ark. at 274.
>
> This court, however, at times has found that the level of evidence was insufficient to meet the requirements under the modus operandi exception. In *Diffee* [*v. State*, 319 Ark. 669, 894 S.W.2d 564 (1995)] the court determined that the defendant's attempted

attack with an ice pick on her husband was not sufficient to meet the requirements under *modus operandi* to allow the act to be admitted in the defendant's murder trial for the death of her mother, whom she murdered with an ice pick.

The *Diffee* court quoted a legal treatise detailing examples of sufficient acts which met the *modus operandi* test. The court quoted Edward J. Imwinkelried, *Uncharged Misconduct Evidence* (1984), wherein Professor Imwinkelried stated:

> There are numerous, excellent hypothetical and actual examples of unique methodology. The hypothetical examples are more colorful. Professor Alan Polasky of the University of Michigan hypothesized the bandit with the silver crossbow. The British examples are just as histrionic; criminals who repeat a particular humorous limerick or who wear the ceremonial headdress of an Indian chief. More recently, Professors Broun and Meisenholder have given us the example of the robber wearing the medieval knight's helmet. The point of each hypothetical is to illustrate the required standard of uniqueness.

> There are several illustrations drawn from actual cases that are equally good examples of the standard. The courts have admitted evidence of other crimes to establish a one-of-a-kind *modus operandi* in the following cases: The burglar always left a bathroom scale on the front door of the burgled residence; the drug trafficker sold a type of white heroin rare in the San Antonio area; the killer always shot the victim in the back near the fourth cervical vertebra; the thief used a rare automobile to make his getaway; the forged money orders were identical in amount, payee, and payer and sequential in number; the burglaries were committed after the burglar bypassed the alarm system in a sophisticated, distinctive manner; the bank robber wore rose-tinted wire-framed glasses and a certain color shirt and wig; the caller making the phone threat always mentioned a "Mary D" during the call; and the smugglers used the same ingenious stratagem even though on one occasion the smuggled contraband was drugs but on the other occasion the contraband was a handgun. In these cases, although the crimes may not have been identical in every detail, the crimes were sufficiently similar and the modus sufficiently unique to justify

> admitting the uncharged misconduct evidence to show identity.

> *Diffee*, 319 Ark. at 677-78 (quoting *Imwinkelreid, supra* at § 3.13).

*Williams*, 343 Ark. at 599-601, 36 S.W.3d at 329-30.

██ Here, there were similarities between the prior crime and the most recent robbery of Ms. Lewis. In the prior crime, appellant also robbed an elderly woman at night, who lived alone. He began pounding on her door and eventually broke through the door. Appellant struck her in the face, took her purse and wallet, and fled the home. However, we cannot say that the similarities of the two crimes rose to the level of *modus operandi*. The prior crime in this case did not meet either requirement for introducing evidence of an unrelated prior act to show *modus operandi*, or a method of operation. Thus, the trial judge erred in allowing the State to introduce the prior conviction as evidence to show *modus operandi*.

██ The State argues that, even if the prior conviction was not admissible to show *modus operandi*, it was admissible under Rule 404(b) as evidence of appellant's intent. Evidence offered under Rule 404(b) must be independently relevant, thus having a tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence. *Cook v. State*, 345 Ark. 264, 45 S.W.3d 820 (2001); *McGehee v. State*, 338 Ark. 152, 992 S.W.2d 110 (1999). The list of exceptions to inadmissibility in Rule 404(b) is not an exclusive list, but instead, it is representative of the types of circumstances under which evidence of other crimes or wrongs or acts would be relevant and admissible. *Cook, surpa* (citing *Williams v. State*, 343 Ark. 591, 602, 36 S.W.3d 324, 331 (2001)). We note that our supreme court held in *Barnes v. State*, 346 Ark. 91, 55 S.W.3d 271 (2001), on similar facts, that prior burglaries where appellant broke into the homes of elderly women in order to rob them were admissible as proof that he possessed the same intent, motive, and plan, *i.e.*, to rob, as he did in the earlier case. As a result, we hold that the prior conviction is admissible under the exception to Rule 404(b) because the prior conviction is independently relevant proof of appellant's intent. We will

affirm the ruling of a trial court if it reached the right result, even though it may be for a different reason. *Williams, supra* (citing *Summers Chevrolet, Inc. v. Yell County*, 310 Ark. 1, 832 S.W.2d 486 (1992)).

### III. Admission of evidence regarding victim's death

Third, appellant argues that the trial court erred in admitting testimony about the victim's subsequent death. Specifically, appellant argues that the evidence was irrelevant and unfairly prejudicial. Arkansas Rule of Evidence 401 (2002) defines "relevant evidence" as evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Under Ark. R. Evid. 403, the trial court has discretion to exclude relevant evidence if its probative value is substantially outweighed by the danger of unfair prejudice. *See Britt v. State*, 334 Ark. 142, 974 S.W.2d 436 (1998). We will not reverse the trial court's determination absent an abuse of discretion. *Id.*

Here, Dr. Kientz, who had been Ms. Lewis's physician for many years, testified that he treated her while she was in the rehabilitation hospital going through an intensive physical rehabilitation program after surgery to repair her broken leg. He testified that initially she made fairly good progress; however, she began having shortness of breath episodes, caused by fluid buildup on her lungs. She suffered from severe coronary artery disease, which was diffuse, and was not amenable to surgery due to her age and the extent of the disease. Following the episodes, she was transferred to Intensive Care at Sparks Regional Medical Center, where she died on November 5, 2000.

Arkansas Code Annotated section 5-12-102 (Repl. 1997) states that:

(a) A person commits robbery if, with the purpose of committing a felony or misdemeanor theft or resisting apprehension immediately thereafter, he employs or threatens to immediately employ physical force upon another.

Arkansas Code Annotated section 5-12-103(2) (Repl. 1997) states that:

> A person commits aggravated robbery if he commits robbery as defined in § 5-12-102, and he:
>
> (2) inflicts or attempts to inflict death or serious physical injury upon another person.

Because evidence of the victim's death was clearly relevant to prove "death or serious physical injury" as an element of the offense charged, we hold that there was no abuse of discretion on the part of the trial judge in admitting this testimony.

## IV. and V. Motion to Suppress

We will address appellant's fourth and fifth arguments together. He argues that the trial court erred in denying his motion to suppress. Specifically, he argues that his arrest was illegal because there was not a warrant and that he did not give consent for the detective to search his vehicle. In reviewing a trial court's ruling on a motion to suppress, we make an independent determination based upon the totality of the circumstances and reverse only if the ruling is clearly against the preponderance of the evidence. *Lamb v. State*, 77 Ark. App. 54, 70 S.W.3d 397 (2002) (citing *Brunson v. State*, 327 Ark. 567, 940 S.W.2d 440 (1997)). Due deference is given to the trial court's findings in the resolution of evidentiary conflicts and determinations of credibility. *Id.* (citing *Stephens v. State* 342 Ark. 151, 28 S.W.3d 260 (2000)).

Appellant asserts that his arrest was illegal in that there was only a verbal order by his parole officer to arrest him. Arkansas Code Annotated 16-93-705(a)(4) (1987) states that:

> Any parole officer may arrest a parolee without a warrant or may deputize any officer with power of arrest to do so by giving him a written statement setting forth that the parolee, in the judgment of the parole officer, violated conditions of his parole.

Appellant is correct in that there was no written statement from his parole officer in this case. Detective Greg Smithson's testimony showed that appellant's parole officer, Pierre Raby, con-

tacted the police department and verbally gave them notice to arrest appellant for a parole violation. Mr. Raby confirmed Detective Smithson's testimony. We recognize that due to the lack of a written statement by the parole officer, there was a violation of the statute. However, we hold that the arrest was otherwise supported by probable cause.

██ ██ Probable cause is defined as "facts or circumstances within a police officer's knowledge that are sufficient to permit a person of reasonable caution to believe that an offense has been committed by the person suspected." *Laime v. State,* 347 Ark. 142, 153, 60 S.W.3d 464, 472 (2001) (citing *Burris v. State,* 330 Ark. 66, 954 S.W.2d 209 (1997); *Hudson v. State,* 316 Ark. 360, 872 S.W.2d 68 (1994)). In assessing the existence of probable cause, our review is liberal rather than strict. *Id.* (citing *Brunson v. State,* 327 Ark. 567, 940 S.W.2d 440 (1997)).

██ Officer Ranells testified that the police officers were given two briefings and ordered to be on the lookout for a red or maroon Buick with fictitious tags; a slender, black male was associated with the vehicle. Ranells testified that he was on duty on October 7 when he saw a car matching the description of the red or maroon Buick. He also saw that a black male was driving. Ranells followed as the suspect increased his speed to forty miles per hour in a thirty-mile-an-hour zone. Ranells got close enough to call in the suspect's license plate number. He was informed that the tags were fictitious and belonged to a 1982 tan Cadillac. Appellant turned into an apartment complex and began walking down the alley. Ranells met him in the alley and arrested him. Here, based on the fact that both the vehicle and the driver matched the description of the robbery suspect that the police were given, the officer had reasonable cause to believe that an offense had been committed by the person suspected. *See Anderson v. State,* 256 Ark. 912, 511 S.W.2d 151 (1974) (holding that the officer, who had received a description of one of the suspects and had seen a car carrying a person he thought to be that suspect, had probable cause for stopping the vehicle). In addition, Officer Ranells observed appellant exceeding the posted speed limit and confirmed before the stop and arrest that appellant was driving a car with fictitious tags. It is a separate crime to display upon a

vehicle any registration plate not issued for the vehicle or not otherwise lawfully thereon. *See* Ark. Code Ann. § 27-14-306(a) (Repl. 1994). A violation of this section provides a police officer with reasonable cause to believe that the driver of the vehicle is committing a violation of the law in his presence. *See Wilburn v. State*, 317 Ark. 73, 876 S.W.2d 555 (1994). Under Ark. R. Crim. P. 4.1(a)(iii) (2002), a law enforcement officer may arrest a person without a warrant if the officer has reasonable cause to believe that such person has committed any violation of law in the officer's presence. Based on these circumstances, we hold that there was probable cause to support appellant's arrest.

■ Appellant also specifically asserts that he was coerced into consenting to the search of his vehicle. "An officer may conduct searches and make seizures without a search warrant or other color of authority if consent is given to the search or seizure." Ark. R. Crim. P. 11.1 (2002). The State must prove by clear and positive evidence that consent was freely given. *Ralph v. State*, 76 Ark. App. 1, 62 S.W.3d 1 (2001) (citing *Norris v. State*, 338 Ark. 397, 993 S.W.2d 918 (1999)). The consent must not be the product of actual or implied duress or coercion. *Id.* (citing *Russey v. State*, 336 Ark. 401, 985 S.W.2d 316 (1999)). "Knowledge of the right to refuse consent to search is not a requirement to prove the voluntariness of consent." *Id.* (citing *Chism v. State*, 312 Ark. 559, 569, 853 S.W.2d 255, 260 (1993)).

■ ■ Detective Bates conducted the search of the vehicle. Officer Copeland testified that he was in the room with appellant at the police station when Detective Bates called to speak with appellant and obtain his consent to search the vehicle. Officer Copeland was able to hear the conversation between Detective Bates and appellant because he held the phone for appellant. Officer Copeland said that Detective Bates asked appellant for consent to search the vehicle, and appellant agreed to the search. There was no evidence of coercion on the part of the officers. A valid consent to search must be voluntary, and "[v]oluntariness is a question of fact to be determined from all the circumstances." *Stone v. State*, 348 Ark. 661, 74 S.W.3d 591 (2002) (citing *Ohio v. Robinette*, 519 U.S. 33, 40 (1996) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218 (1973)). We hold that

there was no evidence to support appellant's assertion that he was coerced into consenting to the search of his vehicle. Based on this testimony, the trial judge did not err in finding that the consent was given freely and voluntarily.

## VI. Batson Challenge

For his final point on appeal, appellant argues that the trial court erred in allowing the State to exercise a peremptory challenge to strike an African-American member of the jury panel in violation of *Batson v. Kentucky*, 476 U.S. 79 (1986). There is a three-step process to be used in cases involving *Batson* challenges. *Hinkston v. State*, 340 Ark. 530, 10 S.W.3d 906 (2000). First, the strike's opponent must present facts to raise an inference of purposeful discrimination; that is, the opponent must present a prima facie case of racial discrimination. *Id.* Second, once the strike's opponent has made a prima facie case, the burden shifts to the proponent of the strike to present a race-neutral explanation for the strike. *Id.* If a race-neutral explanation is given, the inquiry proceeds to the third step, wherein the trial court must decide whether the strike's opponent has proven purposeful discrimination. *Id.* Here, the strike's opponent must persuade the trial court that the expressed motive of the striking party is not genuine but, rather, is the product of discriminatory intent. *Id.*

During jury selection, the State exercised a peremptory strike against Mr. Elder, one of three African-Americans in the jury pool, and appellant challenged the use of the strike. After the challenge was made, the State gave the following race-neutral explanation:

> Mr. Elder initially was not sure whether or not he would need a higher standard than beyond a reasonable doubt when I was questioning him. Secondly, when I was questioning him, he sided with a juror that the Court has now struck for cause, Mrs. Libbey, with respect to her need to see the evidence and facts before knowing if they could make a decision in this case. Mr. Elder has been arrested previously. His arrest was for a failure to answer summons. That type of arrest concerns the State. When questioned by Defendant's Counsel, Mr. Elder said that he would have a problem deciding because the system, quote "ain't fair."

He doesn't know if he can listen to the evidence and decide fairly was a direct quote also. Mr. Elder indicated to the Court that he wanted to believe that the fact that he had a civil case pending before the Arkansas Supreme Court might disqualify him from being a juror, meaning he didn't want to be on the jury because of that. Based on all of those, the State feels like that is a non-race-based decision.

The trial judge then stated that

"[Mr. Elder] indicated he did not feel he could be focused on this case because he had other things pending. . . it was a civil case pending in the Arkansas Supreme Court. I think that while not enough to excuse him for cause, the State has listed enough evidence and reasons to excuse him for a peremptory challenge."

 ██ We will reverse a trial court's ruling on a *Batson* challenge only when its findings are clearly against the preponderance of the evidence. *Williams v. State*, 338 Ark. 97, 991 S.W.2d 565 (1999). Also, we accord some measure of deference to the trial court in that it is in a superior position to make these determinations because it has the opportunity to observe the parties and determine their credibility. *Id.* In *Jackson v. State*, 330 Ark. 126, 954 S.W.2d 894 (1997), our supreme court held that there was a race-neutral explanation provided for striking two jurors where one of them was connected with serious criminal activity and had an ex-husband who was connected with criminal activity as well. In the case at hand, Mr. Elder was previously arrested for failure to answer a summons, and he also has a case pending before the Arkansas Supreme Court. He further made the statement that he struggled with the fact that the system was not fair. We cannot say that the trial court's ruling on the *Batson* challenge was against the preponderance of the evidence in this case.

For the foregoing reasons, we affirm on all points.

Affirmed.

ROBBINS and VAUGHT, JJ., agree.